IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROGER ERVIN | * | |
| Plaintiff | * | |
| v | * | Civil Action No. ELH-13-3337 |
| BOBBY P. SHEARIN | * | |
| Defendant | * | |

\*\*\*

## MEMORANDUM

Plaintiff Roger Ervin, who is self-represented, is an inmate at the State's North Branch Correctional Institution ("NBCI"). He filed suit (ECF 1) under 42 U.S.C. § 1983 against the former Warden, Bobby Shearin,[1] alleging that he was unlawfully denied certain accommodations required by his medical condition. In support of his allegations, plaintiff appended medical and other records to his suit. He seeks compensatory and punitive damages. ECF 1 at 6. Plaintiff subsequently amended his complaint on two occasions: ECF 8 (filed December 2013) and ECF 15 (filed March 2014).

Now pending is defendant Shearin's motion to dismiss or for summary judgment, supported by exhibits. ECF 21. In addition, plaintiff seeks to compel discovery and impose sanctions. ECF 47. Although plaintiff did not file an opposition to ECF 21,[2] he filed a response

---

[1] Frank Bishop succeeded Shearin as Warden on February 18, 2014. *See* Declaration of Bishop, ECF 21-2, ¶ 1. In ECF 1, plaintiff also sued "Fink on the 3-11 Shift." On January 29, 2014, the Litigation Coordinator declined to accept service for Fink, stating: "Unable to identify." ECF 11. As discussed, *infra*, other defendants added by Ervin in ECF 8 and ECF 15 also have not been served.

[2] On April 14, 2014, a Rule 56 notice was sent to plaintiff, pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). *See* ECF 22.

(ECF 28) to the court's Order of March 18, 2014 (ECF 19) directing defense counsel to show cause as to plaintiff's request (ECF 18) for a Temporary Restraining Order.

The court finds a hearing in this matter is unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, plaintiff's motion to compel and for sanctions shall be denied and defendant's motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be granted.

### Factual Background[3]

Plaintiff claims that on January 29, 2012, while he was being escorted to the Segregation Unit, he told Sgt. Fink that he had a medical order requiring his assignment to a bottom bunk bed. Ervin states he was ignored and told by Fink and the "other official" to get on the top bunk or "they would be force[d] to put" Ervin onto it. ECF 1 at 4. The following day, when Ervin was attempting to get off the bunk, he fell and hit his head on the side of a table. He claims he "busted" his head and injured his neck, back, and shoulder, resulting in numbness to his right arm. ECF 1 at 6. Ervin was sent to a hospital in Cumberland, Maryland, where he was treated for his injuries.

In his Amended Complaint, ECF 8, to which Ervin attached medical records, Ervin added as defendants Wexford Health Sources, Inc. and Colin Ottey, M.D. ECF 8 at 10. Neither of those parties was served with the Amended Complaint, however.[4]

---

[3] In this Memorandum, I have generally cited to ECF page numbers, which do not always correspond to page numbers on the exhibits.

[4] Plaintiff also states that he "filed a tort claim" against these defendants because "they did not follow the E.N.T. order, they stopped all [his] medications, in hope that [he] would die." ECF 8 at 6. As discussed, *infra*, plaintiff may refile his § 1983 claims against these medical defendants.

In ECF 8, Ervin claims that, upon his return from the hospital, he was told his cell mate had been locked up for assaulting him. But, Ervin assured the officer he sustained the injuries when he fell off the bunk. ECF 8 at 5. Ervin claims he was then assigned to a lower tier by other correctional staff because they were concerned about him going up and down the stairs in light of his physical condition. And, he alleges that he has "been under attack [ever] since" by both medical staff and the warden who are underminding [sic] [his] medical position." *Id*.[5]

Ervin states he required a "medical shower" for nose bleeds for one year. *Id*. Further, he alleges that he was told he has a sinus blockage near his eye, but medical staff never followed up with an ENT specialist. *Id*. at 6. In addition, Ervin alleges that he was offered a prescription for medication to treat high blood pressure, but he declined to take it because he feared the medication would be abruptly stopped by medical staff, causing him additional health issues. According to Ervin, he raised a concern about the medication and asked if a cardiovascular diet could be tried instead, but claims he was told if he did not accept the treatment offered he would receive no treatment. Ervin seems to indicate that his primary health problems are his sinus blockage and his eyesight. *Id*. at 9-10.

In a "Supplemental Complaint," *i.e.*, a second amended complaint, ECF 15, filed under oath, Ervin named three additional correctional officers as defendants: Sergeant G. Brewer, Sergeant A. Gilpen, and C.O. II Oart. They have not been served with the suit.

In ECF 15, Ervin claims he is disabled by virtue of his glaucoma. *Id*. at 3. According to Ervin, he was prescribed bottom bunk status by "a doctor/physician" after he arrived at NBCI, until he was "maliciously" placed on administrative segregation by Sgt. Gilpen on September 23, 2013, "solely to deprive him of his bottom bunk or having to deal with [plaintiff's] medical

---

[5] In the Amended Complaint, plaintiff also complains about conditions at NBCI as a result of a lengthy "Lock Down" of NBCI.

3

condition." *Id*. Further, Ervin alleges that when he was assigned to administrative segregation he was denied a daily shower as prescribed and did not receive eye drops to treat his glaucoma. *Id*. According to plaintiff, he was denied access to the prescribed medicine for a total of seven days. *Id*. at 4. Ervin also claims he has "been suffering continuous bleeding from the nose, that required him to be placed on single cell status bottom bunk, as prescribed," but defendants have "intentionally ignored or disregarded" his "medical conditions, by continuously moving him [and] placing him on a top bunk solely to deprive him of a prescribed treatment." *Id.* at 5. Further, Ervin asserts that his personal property was lost when he was moved to administrative segregation and that the paperwork he had was damaged or destroyed by Gilpen. *Id*. at 4.

Ervin claims that, on an unspecified date, Seville denied him his lunch tray. *Id.*[6] And, on October 29, 2013, both Seville and Oart failed to feed him or give him his prescribed shower. *Id.* When Ervin was released from administrative segregation he was assigned to a top bunk, then two days later he was re-assigned to a single cell. His assignment to the single cell lasted for one week and he was again assigned to the top bunk of a cell.[7] "Consequently, [Ervin] suffered [a] sever [sic] nose bleed." *Id*. at 4. After suffering the nose bleed, Ervin claims he was once again moved to a bottom bunk, where he remains. *Id*. at 5.

Ervin concludes that as a result of the defendants' actions he has "experience[ed] extensive difficulties with his sight," which continues "to degenerate," and he suffers "continuous bleeding from the nose." ECF 15 at 5. He claims his assignment to a top bunk constituted a malicious and intentional disregard of his medical conditions and was done to deprive him of prescribed treatment. *Id.* In addition, he alleges that defendants have failed "to

---

[6] Seville is not further identified.

[7] Some dates provided by Ervin appear to be typographical errors inasmuch as they do not match the narrative provided. *E.g.*, "On Oct. 22, 2013, the plaintiff was released from admin . . . Two days later around Sept. 24, 2013, the plaintiff was moved again." ECF 15 at 4.

4

safeguard [his] medical needs" by failing to place "clinical alerts" on his identification card and by failing to confirm his cell status before moving him. *Id*.

On March 18, 2014, plaintiff filed a motion for temporary restraining order (ECF 18), seeking to compel correctional officials to follow medical orders requiring his assignment to a single cell and a bottom bunk due to his poor eyesight caused by glaucoma. *Id*. In an Order of the same date, March 18, 2014, this court required defense counsel to respond. ECF 19. Counsel did so on April 10, 2014. ECF 20. Counsel asserted, *inter alia*, that, since December 2013, Ervin has been housed in a single cell. ECF 20 at Ex. B. And, according to defendant, prior to Ervin's assignment to a single cell, he was assigned to a bottom bunk. *Id*.

Ervin replied on May 16, 2014, ECF 28, and submitted a variety of exhibits, including his own Declaration. Ervin asserted, *inter alia*, that Shearin's policy of not noting special medical orders pertaining to housing assignments on inmate's identification cards contributes to violations of those orders.

On August 14, 2014, this court issued an Order (ECF 37) denying Ervin's motion for a temporary restraining order based on information supplied by Shearin. In that Order, this court observed, in part, ECF 37 at 2:

> [D]efendants assert that there have been no medical orders issued requiring plaintiff's assignment to a single cell; however, since December of 2013, he has been housed in a single cell. ECF 20 at Ex. B (Affidavit of Lt. Pennington, Housing Unit Manager). Prior to his assignment to a single cell, plaintiff was assigned to a bottom bunk in a different cell. *Id*. Additionally, the only medical orders on file for plaintiff pertaining to security issues is one directing that plaintiff be handcuffed using oversized cuffs due to shoulder pain.[8] *Id*. Another medical order requiring assignment to a bottom tier unit for twelve months, issued on August 3, 2013, was rescinded three days later because the assignment would not benefit plaintiff's condition (chronic nosebleeds). *Id*. at

---

[8] The handcuffs referred to have an extra-long chain which permits the inmate's arms to be down at his sides, rather than pulled behind his back, to reduce any strain on the shoulder joint. ECF 20 at Ex. B.

5

> Ex. C, pp. 43 and 47 (medical records). The cuffing order remains effective until January 2, 2015. *Id.* at Ex. B.
>
> Security staff do not make medical assessments for purposes of determining who needs a single cell. *Id.* While there is no plan to remove plaintiff from the single cell he is in, priority must be given to inmates who do have medical orders requiring a single cell. *Id.* Finally, evidence submitted with the response to show cause indicates that plaintiff's vision is 20/30. *Id.* at Ex. C at p. 94.

Thus, there was a medical order issued requiring Ervin's assignment to a lower tier. But, that order was rescinded when it was discerned that the conditions for which it was prescribed (chronic back pain and nosebleeds) would not be benefitted by an assignment to a lower tier. *Id.* at 3.

As indicated, the only defendant who has been served with the complaint is former Warden Shearin. The current warden of NBCI, Frank Bishop, asserts that as Warden he has no authority to dictate the type of medical treatment an inmate receives from the health care provider or to influence medical decisions. ECF 21-2, Ex. A. In addition, Lt. Bradley Wilt provided a Declaration detailing the procedures in place to insure medical orders are properly distributed and followed. ECF 21-3, Ex. B.

Specifically, when an inmate arrives at NBCI a medical assessment is made by the health care providers. If an inmate has special needs, a medical order is generated. *Id.* at ¶ 3. A copy of the order is then provided to the inmate, custody staff, and NBCI's traffic office. *Id.* Traffic office staff is responsible for updating the Inmate Data Manager ("IDM") with the medical order information. *Id.*

Medical orders may also be generated after the initial medical assessment if an inmate develops a condition that the medical staff determine needs to be addressed. Common medical

orders requiring notification of security staff concern bottom bunk assignments, and exceptions to the ordinary manner of applying handcuffs.

When an inmate is assigned to administrative segregation or housing unit 1, the IDM is checked for orders regarding special medical needs. If the IDM shows an order, the security staff comply with its directive; if the inmate presents a medical order to security staff, the medical unit is contacted to verify its authenticity. Upon verification of the order, it is added to the IDM and custody staff then comply with it. *Id*. As an additional safeguard, once each quarter NBCI's medical unit circulates a Special Needs List to all housing units, listing alphabetically every inmate with a special need. *Id*. at ¶ 5.

When an inmate is brought to Housing Unit 1 during a night shift it is usually because he has been given a notice of infraction and is assigned to administrative segregation pending a disciplinary hearing. *Id*. at ¶ 6. If security staff working the night shift have a question about a medical order, the practice is to place the inmate in a temporary cell until the day shift arrives to make a more permanent cell assignment. *Id*. To the extent Ervin was assigned to a bunk contrary to standing medical orders, defendant asserts it was because the order was not on Ervin's IDM at that time.

In his "Reply to Defendants' Motion To Show Cause," ECF 28, Ervin attached several exhibits, including his own Declaration. ECF 28 at 8-11. He asserted that the Warden regularly accesses medical records, and that the practice at NBCI is to ignore procedures in place regarding medical orders. *Id*. Further, he claimed that glaucoma is a degenerative disease and affects more than visual acuity. *Id*. Ervin does not, however, dispute that currently there is no medical order requiring his assignment to a bottom bunk. *Id*. at 4. Rather, Ervin suggests that he has been assigned to a bottom bunk for some time. *Id*. He also claims that he was subjected to

"retaliatory transfers from cell to cell to deprive him of a bottom bunk, as ordered by a doctor." ECF 28 at 3.

Additional facts are included in the Discussion.

**Standard of Review**

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. In that circumstance, the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[9]

---

[9] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A]

8

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165-167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md.

---

Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011), *aff'd.*, 707 F.3d 437 (4th Cir. 2013), *cert. granted*, ____ U.S. ____; 134 S.Ct. 2898 (2014)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that

the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Ervin filed an affidavit pursuant to Fed. R. Civ. P. 56(d), seeking an order requiring defendants to disclose pictures he believed were taken of him following his fall from his bunk in January 2012.[10]  ECF 31.  In my Order of August 14, 2014 (ECF 37), the defense was required to advise whether such pictures exist and, if available, to provide copies to Ervin with notification to the court that they had been sent to him for review.  *Id*. at 3, 4.  Through counsel, Shearin advised the court on September 12, 2014, that the photographs Ervin sought could not be located.  ECF 45.  In a Declaration under oath, Correctional Case Manager Randy Durst stated that he checked the prison's records to locate any photographs taken of Ervin the day he fell from his bunk.  Durst averred that after conferring with both medical and traffic departments and checking both electronic and paper files, no photographs were found of Ervin taken on January 30, 2012, following his fall and just prior to his transport via ambulance.  *Id*. at Ex. 1.

Ervin filed a response to defendant's status report regarding the pictures, claiming he had already provided evidence the pictures exist and the assertion they are not available is a deliberate attempt to prevent Ervin from obtaining the pictures.  ECF 47 at 2.  He claimed that the fact the Commissioner of Correction ordered Shearin to respond to a Public Information Act ("PIA") request regarding the pictures of Ervin is proof of the existence of the photos.  *Id*.  Further, he asserted that he has been threatened with "lock-up" if he continues to ask about the pictures; that correctional staff will not honor any court order requiring their disclosure; and that

---

[10] Ervin also claims there are "several pieces of documentation" that he wants verified and authenticated through limited admissions or depositions, but he does not specify what that documentation includes or why they are "necessary to prove his claims."  ECF 31 at 2.

under no circumstances would Ervin receive the pictures. *Id*. Ervin seeks an order requiring disclosure of the pictures as well as a penalty fee for every day they are not disclosed. *Id*. at 4.

The evidence referred to by Ervin consists of two administrative remedy responses to his PIA request for copies of the photographs. ECF 47-1. Ervin submitted a request for the pictures to Shearin on March 4, 2012, referring to the photographs as being related to a slip-and-fall incident that occurred on January 30, 2012. *Id*. at 4. Shearin erroneously responded that photographs taken following an assault or use of force are not provided to inmates as the photographs are considered security sensitive. *Id*. Ervin appealed to the Commissioner of Correction who found the appeal meritorious in part because Shearin did not address Ervin's request for the photographs under the provisions of the PIA. *Id*. at 3. Ervin did not submit a copy of the subsequent response from Shearin required by the Commissioner; thus, there is no evidence that the photographs are still available or that they were improperly destroyed.

The court notes from Ervin's own pleadings that his cell mate was initially suspected of assaulting Ervin after Ervin fell from his bunk. To the extent those charges were dropped after Ervin assured officials he was not assaulted, the evidentiary need for those photographs ceased to exist, from the perspective of the institution. In other words, the photos were for the purpose of documenting the consequences of the alleged assault. Additionally, the claim raised in this case has less to do with the severity of the injuries sustained by Ervin in the initial fall and is more appropriately focused on whether he was improperly assigned to the bunk from which he fell. Therefore, Ervin's motion shall be denied.

As noted, Ervin was treated for his injuries. Thus, to the extent proof of Ervin's injury is needed, that can be established through the treatment records. Therefore, the court is satisfied that no further discovery is required. Moreover, I am satisfied that, based on the documentary

evidence submitted by both sides, it is appropriate to address Shearin's motion (ECF 21) as a motion for summary judgment, because it will facilitate resolution of the case before considering defendant's motion for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *rehearing en banc granted* (July 1, 2014).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "prevent factually unsupported claims and defenses from proceeding to trial." *Id.* at 526 (citation and internal quotation marks omitted).

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the court may not make credibility determinations on summary judgment. *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such a affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, ____ Fed. App'x. ____, No. 14-6521 (4th Cir. Sept. 11, 2014) (per curiam). However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson,* 477 U.S. at 248. On the other hand, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, as noted, the court must also abide by the

"'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Discussion

Shearin argues that the undisputed facts warrant summary judgment in his favor because the suit is predicated on the theory of respondeat superior. Memorandum (ECF 21-1). In addition, he argues that plaintiff failed to exhaust his administrative remedies and that the action is barred by qualified immunity. *Id*. I will address only the first contention, which is dispositive.

Ervin filed suit pursuant to 42 U.S.C. § 1983, which "' is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)). A lawsuit under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999). To proceed under § 1983, a plaintiff must allege that 1) a right secured by the Constitution or laws of the United States was violated, and 2) that the alleged violation or deprivation was committed by a "person acting under the color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988); *see Baker v. McCollan*, 443 U.S. at 140; *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 112 (2011).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th

Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

In a case such as this one, involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, ____ F.3d _____, 2014 WL 2978541, at *8 n.8. This is in contrast to an excessive force case. *Id*.

The subjective component of the Eighth Amendment claim requires "subjective recklessness" in the face of a serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir.

1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Moreover, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4th Cir. 1998). Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk. . . ." *Brice,* 58 F.3d at 105. But, without evidence that a healthcare provider linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Johnson,* 145 F.3d at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge). Even if the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844.

Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. Moreover, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977). An inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir.1977); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975).

Of import here, there is no respondeat superior liability under § 1983. *Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978); s*ee Love-Lane v. Martin*, 355 F.3d 766, 782

(4th Cir. 2004) (no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Rather, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Ervin's claim against Shearin is one based on a theory of *respondeat superior*. In other words, he has not alleged that Shearin himself ignored valid medical orders resulting in his injury. Instead, he has imputed liability to Shearin based on the actions taken by correctional staff who worked under his supervision. As indicated, liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, Ervin's claim against Shearin fails.

The remaining unserved defendants include correctional officers who are alleged to have assigned Ervin to a top bunk when he had a medical order requiring a bottom bunk assignment. *See* ECF 1 at 3 (claim as to Sgt. Fink) and ECF 15 (amended complaint). The evidence produced by Shearin in response to Ervin's motion for a temporary restraining order established that no valid order existed regarding Ervin's bunk assignment. *See* ECF 10 at Ex. B. Therefore, the

claims as to Sgt. Fink, Sgt. G. Brewer, Sgt. A. Gilpen, and Officer Oart shall be dismissed for failure to state a claim upon which relief may be granted, pursuant to this court's authority under 28 U.S.C. §1915A.[11]

Ervin also amended the complaint to include claims against "Wexford Health Sources Inc." and Dr. Colin Ottey. ECF 8 at p. 10. Ervin claims he has not received adequate medical care for nose bleeds and must wait too long for refills on prescription eye drops to treat his glaucoma. *Id*. These defendants were never served. Therefore, they shall be dismissed, without prejudice. Ervin remains free to file a separate action asserting his § 1983 claims against medical care providers. For Ervin's convenience, the court will permit him to incorporate by reference any records he previously submitted as exhibits. But, if he chooses to do so, he must make clear his intention to do so and he must refer to the case number for this case and to this Memorandum (ECF 50).

A separate Order follows.


December 12, 2014                     _____/s/_____
Date                                  Ellen L. Hollander
                                      United States District Judge

---

[11] This court is obliged by 28 U.S.C. § 1915A to screen prisoner complaints and dismiss any complaint that is frivolous, malicious or fails to state a claim upon which relief may be granted. In deciding whether a complaint is frivolous, "[t]he district court need not look beyond the complaint's allegations . . . . It must, however, hold the pro se complaint to less stringent standards than pleadings drafted by attorneys and must read the complaint liberally." *White v. White,* 886 F. 2d 721, 722-23 (4th Cir. 1989).